My name is Scott Karen. I'm from the United States Attorney's Office in the District of Oregon, and I represent the government, the appellant, in this matter. And I would ask if I could reserve four minutes for my rebuttal. In this case, there is really one main dispositive issue. And that issue is, did the officers, based on their experience and circumstances, have probable cause to arrest the two defendants on June 22nd of 2001? Now, here, even though the district court's findings repeatedly articulate probable cause, the court nonetheless said probable cause did not exist to arrest them. There are three specific places in the district court's opinion where the court articulates, almost verbatim, the probable cause standard. In June, this district court found that there was a fair probability that Defendants Jay and Baker were moving something illegal and they did not want the police to find it. The court went on that a prudent officer reasonably could conclude that Defendant Baker removed the bundle because it was contraband. They did not want the police to find. The court also found that the totality of the circumstances would have made it obvious to a prudent police officer that criminal activity likely was afoot and that Baker and Jay were involved. Now, even though the district court articulated the correct legal standard from Valencia, that there is a fair probability that criminal conduct could be occurring or may be afoot, or that an item could be contraband or could contain evidence of a crime, where the court went astray was in applying that legal standard to the uncontested facts of this case. Rather than taking a step back and looking at the facts of this case from the standpoint of the totality of the circumstances, as viewed through the lens of experience, 25 years of collective experience with these two officers with a specialization in gun, drug, and gang cases, could these officers reasonably believe that there is a fair probability of criminal conduct or that the item they wanted to seize from that vehicle contained evidence of a crime or contraband? Well, of course, really the only item they had on a legitimate basis at that stage to look for was the gun. Well, I would submit it sort of depends on where you want to start the focus at. When the defendants go back to the scene of the duplex and there's that active, what can only be called counter-surveillance activities, and they remove hurriedly a bundle from that house, absolutely, the officers at that time believe that what is moving is a gun. There's another factor that factors in. It was a great big bundle, and why would that be a gun? Well, it was a bundle, not a great big one. And I think what the opinion talks about is that Mr. Baker came out of the duplex holding something wrapped in a cloth up against his chest as he hurried down to the car. Wasn't there something awkward or I had the impression as well that there was something more substantial or sizable than a firearm? Well, certainly there was, Your Honor. And what we know is that when the search warrant is executed, there is 447 grams of crack cocaine, a turkey baster, a coffee carafe, and then there are two guns that are under the seat. So that object, I mean, it's not small, but it's not huge. The issue, though, is even though the district court, one of the opinions that she finds is even after she says that, hey, there was fair probability that a crime was occurring or something illegal was happening. She says they're moving something illegal, which actually gets to a slightly different question. What's – is there necessarily a criminal offense involved in moving something illegal, to use the phrase the Court used? If the possession – if they are moving something illegal or the possession of that item is illegal, that would be a crime. But here also, that finding has to be looked at. The Court also made the finding that in the totality of the circumstances here, on page 22 of the opinion, the totality of the circumstances would have made it obvious to a prudent police officer that criminal activity likely was a foot. So in the district court's opinion in her findings, she has made the conclusion that whatever that item is, it is something illegal, it is contraband, and it is indicative of criminal activity. The problem, though, is even though this bundle may be larger than simply a handgun – and that's what we're looking for here is a handgun – it doesn't mean that it's not a handgun. There's a case that I'd like to sort of draw the Court's attention to, and it's actually cited in Defendant Jay's brief, and that's FOUCH, F-O-U-C-H-E. It's on page 14 of their brief. The government didn't have a chance to read the facts of this opinion, of that case, prior to our reply. It's cited in her section on simply outlining the probable cause standard, and there's not really an issue about that. But in FOUCH, there's a robbery report where an eyewitness was unable to identify a suspect, but they upheld an arrest based on probable cause, because the officer could have found a reasonable basis to arrest the person. Was there something distinctive about that bundle? No, there was not. It was a bundle. But that's not standard. It doesn't have to automatically telegraph its existence, that this is the handgun. But that bundle was consistent with something that could be a gun, multiple guns, a gun box, a gun safe. So if they've been struggling to move a washer and dryer, you'd say there's probable cause because maybe inside the washer and dryer there's a gun? Is there a limit to your argument? In other words, anything goes once they're carrying something? I would assume that there are limits, Your Honor. I mean, I'm not saying that, hey, if they were moving anything in the world. But here, what we look at when we look at those limits, as we know, the Supreme Court hasn't said you need three items of evidence to find a crime or you need four items. It sort of depends on the circumstances. Here, I think what you look at is what are they doing beforehand? If they were simply walking up to the house, putting on a washer and dryer and trying to load it down to a truck or something like that, I don't think anyone in the world would look at that just on that face and say, oh, I bet there's a crime occurring here. But where you have Mr. Baker roughly matching the description of the suspect in terms of height, weight, race, age, and gender, where you have Mr. Baker linked all over the place with a car that the suspect was driving on the 16th in which he takes out a gun, chambers a bullet, points it at someone, and says, you have five minutes to get out of my neighborhood before I kill you, he's in that car in March of 2001, he's in it in June of 2001. On June 17th of 2001, it's at a residence that is independently associated with him and his girlfriend. And on June 22nd, it's there again. Now, that is absolutely true, Your Honor. And that's one of the reasons I urge this Court to look at Fauch. Now, the thing is, they did not identify him. Defendants make a significant, they play this up, and they should. But the issue is, he was not eliminated. He was never eliminated as a suspect. And what's important about that identification is, when that was shown to the witnesses, they look at it, and they didn't say, he's not here, but rather, selection was difficult because the person was wearing a do-rag, a nylon cap, a black one on their head on the day of the incident, and none of the suspects in the six-person throwdown had a do-rag, thus making selection difficult. Counsel, I have a question that is kind of on a different topic. So just kind of segue to that, if I may. I will. And for the purpose of this question, I want you to assume that the district court's analysis of the probable cause question is correct. Even if it were correct, would the two defendants, Jay and Baker, be in different situations because of our doctrine of standing? In other words, would they both have standing to contest the search of the car or not? And in other words, would one win and one lose, even if the district court were otherwise correct about its analysis? Yes. There is a difference here. And here, Mr. Jay has standing. Under the doctrine of racist and set down by the United States Supreme Court, Mr. Jay, as the owner who had title to that vehicle, has standing to object to a search of what is in that vehicle. Mr. Baker does not. He is not the owner. He is what they call under the Supreme Court a mere passenger. So, yes, this court can say, hey, there was not probable cause to arrest here, but it is Mr. Jay whose rights were violated. The seizure … But the evidence didn't come directly from the arrest. Correct. If it had come on their person at the time of the arrest, they'd be in the same situation. But the oddity, if you follow down that road, is that one benefits and one doesn't from … That is absolutely correct, Your Honor. Because here, when Mr. Baker is in the car and he's kind of, for lack of a better word, messing around or furtive activity with something, when he gets out and puts something back in the vehicle, he shuts the vehicle door and then walks away from it. Now, what's noteworthy about this car is it's on a public street. It's Jay's vehicle. That's a recording. It's Jay's vehicle, and both windows are down on that vehicle. He's not manifesting an expectation of privacy. And under Rackus, even though he is arrested, and if the court finds that the arrest of Mr. Baker was unlawful or impermissible, the evidence didn't come from that arrest. The evidence came when they received consent from Mr. Jay to search the vehicle, when Mr. Jay, within 10 to 19 minutes of his arrest, tells the officers, hey, Mr. Baker brought in either a gun, dope, or drugs, and then they get a warrant. Of course, Judge Brown said that it did come from the arrest, that the arrest tainted it, because if it hadn't been for the arrest, all of this wouldn't have happened. Judge Brown did say, as to Mr. Jay, that the unlawful arrest of Mr. Jay, in effectuating Mr. Jay's Fourth Amendment rights, the consent was tainted by the unlawful arrest. And his statements, though voluntary, could not be used against Mr. Jay because the Fourth Amendment exclusionary rule was protecting Mr. Jay's Fourth Amendment rights, not Mr. Baker. That may be the argument you're making. I understand that, but that is not what Judge Brown was saying. Judge Brown simply said, I believe, that Mr. Jay's consent and statements were tainted by the unlawful arrest. That is correct. So there was an unlawful arrest of both of them? Yes. Oh, absolutely. Under Judge Brown's opinion, she finds that there was an unlawful arrest of both of them. So why didn't that taint it? Because the taint, the seizure of the evidence, does not come off of Mr. Baker's person. It comes out of a vehicle that he does not have an objectively reasonable expectation of privacy in as a mere passenger. In Rackus, the Supreme Court held. But if there hadn't been a tainted arrest, what would the basis have been for searching that car? You're not relying on a tarry stop. Judge Brown said that over and over. And I would respectfully disagree with Judge Brown. The government made the argument on three separate occasions that we were still preserving tarry. It was briefed. It was argued. We did not pursue it in our supplemental briefing. But that is still an alternative finding for this Court. Mr. Baker gets out of that vehicle. He is taken into custody outside that vehicle prior to being taken into custody, prior to the unlawful arrest. He voluntarily put back whatever he had into that vehicle, shut the door, and walked. So the arrest did not stem from the unlawful custody of Mr. Baker. He ditched the item before that back in the vehicle. Your Honor, with ---- He took it, momentarily took it out, then put it back. How does that lead to a basis for search? Well, the basis for the search is, I mean, if the Court finds that the arrest was unlawful, I mean, the officer's search. The issue, though, is if there's an unlawful search, whose rights are being violated and who benefits from the suppression? Mr. Jay certainly does. But Mr. Baker is a mere passenger, doesn't have that reasonable expectation of privacy under Supreme Court and Ninth Circuit precedent in Twilley to benefit from that unlawful search. Yeah, but if it's all being brought about by an unlawful arrest, why doesn't that taint it all? In because it doesn't ---- And Judge Brown, I would submit, never addressed the standing issue. In Rackus and Twilley, the Court has repeatedly held that where it is a mere passenger, their objective ---- I mean, unless Mr. Baker has an objectively reasonable expectation of privacy in that place to be searched, which here he does not, that items are admissible against him. But you mean you can search anyone's car at any time, even with regard to something that you're looking for, without regard to whether the thing that stopped the car was an unlawful arrest? No. I mean, the government's not saying that. I mean, and one of the distinctions that has to be made is between a driver and a passenger. Now, Rackus did allow the possibility that where a passenger asserts a property or possessory interest in the vehicle or the item to be seized, they could have standing or an expectation that they could assert in court. Mr. Baker, though he had the ability, did not assert a property or possessory interest in either that vehicle or those items. And as such ---- Or the item? Or the items. He never testified. He didn't want to be attached to what the items were. Absolutely. He was doing that for a reason, not to throw his hands up. And that's absolutely true. That is absolutely true. But he had the ability to come into court. Now, I know there are cases cited from outside our district. In Pino and Paulino, the two cases from the Second and Sixth Circuit, in one of those cases, the one where the person hid the stuff furtively in front of the officer under the floor mat and put his feet on it, he said at the scene, I don't know what you're talking about. But in court, he unequivocally testified, yes, that was mine. Nonetheless, the Second Circuit in that case said, given his furtive activities in front of an officer and hiding something under the mat, though that he might have by conduct subjectively believed he was keeping it private, objectively it wasn't reasonable. Baker goes a step further. He puts it in the vehicle, shuts the door, and walks away. Your Honor, I know I am into my rebuttal time. If I could. I'll give you a couple of minutes because we've asked quite a few questions. Thank you. Thank you. Whoever is planning to go first, Ms. Bergeson. Very much, Your Honor. Nancy Bergeson, and may it please the Court, I'm representing Derek Jay in this matter. The lower court thoroughly and soundly considered the facts in the law in this case, and Judge Brown's opinion should be upheld by this Court. Why isn't Judge Brown's factual findings as related by the U.S. Attorney's Office sufficient to find probable cause? I mean, she does say the things that she was quoted as saying. Your Honor, I think that what Judge Brown does is concede that there may have well been a reasonable basis to detain the defendants under Terry v. Ohio. No, she says more than that. She says that it's – indeed, she uses the key words. There was a fair probability that Jay and Baker were moving something illegal and did not want the police to find it. Fair probability seems to suggest that there's probable cause. She says fair probability to conclude that the defendants may have been moving something that was contraband. But the standard for probable cause is that there is a link to the defendants committing a crime, so that there's a fair probability that the defendants have been shown to have committed a crime. Well, if they possessed contraband in this case, wasn't that a criminal offense? There are a number of scenarios that one could construct that would suggest maybe they have contraband, maybe they don't. Well, let's start with her factual finding. I want to take the maybe out of that part, because she's got a sufficient finding to support probable cause of moving something illegal. I'll use her phrase. Okay. If there's probable cause that they're moving something illegal, I guess the question becomes is there enough of a connection between moving something illegal and the crime that's necessary to have probable cause that a criminal offense is being committed just by arrest. And I understand her discussion goes on to talk about the need for specific intent and so forth, but since the only kind of items that are really under consideration here would be either a firearm or drugs, in this case possession of either would be sufficient, I don't understand what the specific intent discussion is all about. It seems to me her finding is tantamount to finding probable cause, which she did not conclude, so there must be something missing in between, but I'm not sure what's missing. Well, I think that what's difficult may be with the words that she has used, the fair probability. I think there are two different ways I'd like to respond to that. I think, first of all, there are scenarios that would suggest that absolutely innocent behavior could be occurring. It could be that after Ms. Foster is stopped and speaks with Mr. Baker, that she implores him to get everything belonging to him out of the house, because she's now lying. Is it, again, I mean, it doesn't matter if there's a possible innocent explanation. If there's a reasonable officer would have probable cause to conclude that there's a criminal explanation. So it's not a good issue. Maybe the useful example would be if a police officer is in, let's say, in Portland, Oregon, in Old Town, and comes upon two Hispanics whom he or she believes is up to no good, and can, based upon sort of the circumstances, conclude that they are, there is criminal, some sort of criminal activity afoot. Is that probable cause to arrest? And I don't think it is. Let me change the words slightly. To use the words that she used in what I think is a key sentence, was there in your hypothetical situation a fair probability that the two individuals were moving something illegal or were committing a criminal offense? The question is, ultimately, even if you assume it's contraband, what criminal offense is it? And if we're simply just – but that's nothing but a matter of speculation. And so then – Well, let me change the question to a legal one. Is it your – the definition given by the district court of probable cause is probable cause to arrest exists when, quote, under the fatality of circumstances, none of the arresting officers, a prudent person, would have concluded that there was a fair probability, bracket, the defendant, suppose bracket, had committed a crime. Does that require specification of knowing exactly which crime is being committed? Not a specific crime, but a type of crime. And I think that's what I've tried to argue in my brief, which is it is not enough to simply say that an unspecified crime, a nameless, characterless crime, has been committed. Drugs and guns in this context are not related to a sequence of events that would – that would permit an inference that either one or both were being committed. It is simply a matter of speculation that a crime or some contraband is in this bundle. And that's – What if you had a situation in which someone brags to his neighbors that, I have committed four crimes against the United States, and I'm really happy about it because I don't like the government. And they – these are a bunch of upstanding citizens who go to the police. Now, does that mean there's not probable cause, even though they're not really sure what the crimes are? Do they have to know more? Do the neighbors have to say, well, is it tax evasion? Is it importing heroin? Tell us more. I believe there has to be some degree of specificity for the Fourth Amendment to be adequately protected. And I think I, in – But you can't confess to crimes generally with impunity without getting involved in any kind of arrest because you're not willing to tell people what the crime is? If a person is to say, I committed a crime, and I don't think that the – that law enforcement then has a sufficient articulable basis upon which to either make a stop for their inquiry or to arrest. There has to be – I mean, when we're talking about the Fourth Amendment, we're certainly talking about the issues with respect to particularity. Now, when you get a warrant, you need to state with particularity what is it that's going to be seized. If this information were taken to a judge that maybe these folks have contraband, would a judge issue a warrant for a search? I doubt it. And I don't think the judge should. Because there has to be some direction, some nexus between the conduct of the defendant and specific criminal activity. Now, all of the cases that the government has cited saying that, well, you don't need to with precision say exactly what crime has been committed. Still, if you look at those offenses, there's a general type of crime. There's either people running from an area where it's likely a robbery or burglary has been committed. But to the contrary, is there any authority that says you have to have a specific type of crime? Because generally the statement is, as the district court said here, had committed a crime, not a particular category of crime. Well, I think that if this Court extends the notion of probable cause to arrest to something so general and so vague, I think you seriously risk undercutting the essential protections of the Fourth Amendment. And even in the context of Terry v. Ohio, particularity is at the core of the Court's reasoning. Justice Warren, speaking for the Court in Terry v. Ohio, said these words, and I think this is instructive in terms of what the questions this Court is asking. This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence. And if we are to deal in vagueness and generalities, we have eviscerated the Fourth Amendment. Well, is it really so vague and general here? I realize I'm shifting now from a legal question to a factual question. But if you had asked those officers, what do you think was in that bundle, I don't think any of us would have expected them to say anything other than firearms or drugs. I don't think we're thinking it's fraudulent stock certificates. So it's not like they're being picked up just because we think they're bad guys. They had a pretty clear idea of what it was they thought they were going to find. These officers were seasoned and they had hunches. And they turned out to be right. But based on the observable and objective facts and criteria, anything could have been in that bundle. And the government never points to the facts. What the government relies on consistently in its briefing to this Court is the 25 years of experience and the hunches, the beliefs, the subjective beliefs of these officers. And with all due respect to the officers, their hunches, their intuition may be that they are not being punished for what they did.     And they're being punished for what they did. And that's a fact that is going to be absolutely sharpened by those years on the street, absolutely sharpened by those years on the street. That doesn't mean necessarily that their respect for the Fourth Amendment is particularly refined. I'm going to suggest that your co-counsel or counsel for Mr. Baker may wish to have a little time. Thank you very much, Your Honor. Good morning. May it please the Court. Gary Bertone appearing for Mr. Baker, and I, too, have a cold. I think the issue that I'd like to deal with, given the time constraints here, is the standing issue, which was brought up by Judge Graver. And as the Court knows, standing is a question of fact and a question of law. And I think the facts in this case are very unique in that they are distinguishable from the cases and the facts and the cases that have been cited by the government. You know, we're not dealing with a trunk. We're not dealing with a purse. We're not dealing with a glove box. We're not dealing with just a traffic stop that escalates into something else. What we have here is an individual, Dion Baker, who the police believe may be in possession of firearms. And, you know, I could go back and we can talk about whether or not they had probable cause to believe that. Let me ask you a question along the following lines. Let's say that you decide to put a bundle of contraband into Mr. Caron's car, and you do that and you leave the scene. And he says, hey, search my car, no problem. Do you have standing to object to the voluntariness of his consent or suppose that it's just searched without his consent for no reason? Do you have standing to complain about the Fourth Amendment violation in searching his car? As you describe the situation, probably hesitantly say no. So what's different here in Mr. Baker's situation? Because what has been established by the surveillance and what the officers were aware of is that, number one, Mr. Baker and Mr. Jay appeared at least, again, looking at this from a standing issue, appeared to be working in concert. They have already had contact with Mr. Jay, with Mr. Baker. It's not his car. It's not his car. It's not his car. That's true. They've already had contact. They've established that fact. You have a situation where they see Mr. Baker coming from a house that has been associated to him. You have what is reported by the officers as what has been described by Mr. Caron as the countervailing measures that were taken by them. You have a situation where the officers actually see my client in possession going into that home, bringing out whatever it was. He was bringing out, as you said, it could have been a washer dryer. Does that raise an issue? Or it could have been a turkey. I don't know. He was carrying out a bundle, a bundle that was actually covered in a tan shirt that was similar to the tan shirt that was seen in my client's possession. You have a situation where the two of them, so they're in the same car. You have a situation where the vehicle is parked, and whether or not they actually saw Officer Santos is up to debate. But my client taking some actions now. What are the actions to conceal? What my client was carrying? What are the actions to actually secure? We know that the vehicle was stopped and that the individuals were getting out of the car at the time that Officer Santos came into contact with them and ordered them essentially to stop what they were doing. I guess my difficulty with your position is it seems to me that when someone places something in another person's car and walks away, whether this is right or wrong, it seems to be that our cases suggest that you do that at your own risk vis-a-vis Fourth Amendment searches. Well, I'm not so sure that Mr. Baker necessarily walked away. I think he was ordered to stop what he was doing. And it was in a situation where there was an abandonment. And, again, we go back to the fact that my client was seen in possession of this particular item, the particular bundle. And so not only do we have, I think, when you take a look at the totality of the circumstances here, facts that establish that there was an expectation of privacy. We also have some established by the totality of the circumstances that you have a situation where my client, even though he didn't verbally assert, certainly he invoked his rights immediately after he was taken into custody, by the facts himself established a situation where he has some possessory interest in that particular bundle. I think it's very clear. I mean, the government certainly contends that their whole focus appeared to be Mr. Baker and that, you know, he evidently was in possession of guns. So I think, and when you take a look at the cases, the Rakes case, you know, you have a situation there where it was a glove compartment. And there really isn't any evidence establishing whether or not the passenger in the car was aware of what was actually in the glove compartment. You have a situation where the trunk, and, again, the question is whether or not the passenger was aware of what was in the trunk. We clearly know exactly what was going on here based upon the observed sequence of events. And as the officer, Stradley and I believe Officer Santos testified to, this was a situation where they saw my client's possession, and they believed him to be in possession of the guns. Again, we can go back and talk about the probable cause going back to the June 16th incident, because I think there are some discrepancies in regards to their underlying belief, and certainly have challenged their belief that they have probable cause just based off that particular incident, given the fact that you have a situation that is described where you have a physical description, and you have officers that actually had contact with Mr. Baker approximately three months before the June 16th incident. And for them to conclude based on an association with the car and the fact that Mr. Baker is black and the fact that Mr. Baker roughly matched the description that they had probable cause, I think it is significant that when there was a throwdown, even though none of the witnesses excluded anybody, that they were unable to identify. So what did the officers have? They had a vehicle that is connected to Mr. Baker associated. And the denial of that connection by the woman whose name I'm blanking on right now. Foster. Foster, who said nothing, he's not hit. But it turns out that, oh, yeah, there was a relationship there, and I think the fact of her denial itself becomes positive evidence that there's a reason for her denial. There's a reason she's trying to break the link, which makes the link, I think, even stronger. Well, I don't know if we can speculate what that reason is, quite frankly. I mean, when you have a citizen police contact, I mean, denial is something that probably is the first reaction. What's interesting is that the police never took the time to find out who the register owner of that car was. Certainly that would have been a clue. I'd like to move to a little different subject. Two or three times in Judge Brown's opinion, she mentioned that the government does not rely on a Terry stop for reasonable suspicion. Do you contest the fact that there was reasonable suspicion to stop the car? Certainly we have a situation where the officer observed a number of traffic violations, and that information was relayed to Officer Santos. The opposing counsel says, no, that wasn't waived, that they had briefed it, and, in fact, that was an argument that was made. Do you agree with that? I vaguely recall that it was briefed. I don't know how strong of an argument it was actually made. I think that issue was actually ‑‑ The issue was really before the court. Pardon? That issue was before the court, then, as to whether there was reasonable suspicion for a Terry stop. That issue was before the court, and the court, I think, in its order referenced the fact that there may have been reasonable suspicion for a stop. But, however, we get into situations ‑‑ If there were, wouldn't that have justified a search of the car to protect the officers from the possibility of a gun being there? If that was the only basis, maybe. But what we have is a situation here where the action that was taken was certainly more intrusive than a mere stop. I mean, they went from point A to point C, practically. I mean, couldn't you have searched the car to find whether there was a gun there? I don't know if you could search the car just based on ‑‑ A Terry stop? Well, on a Terry stop, they probably could search the car. They could. But that's not what happened. And to go back and establish now a ‑‑ If that's correct, does something like the inevitable discovery doctrine come into play? In other words, if doing everything is exactly right to follow Judge Hugg's question, there would have been a search of the car anyway. Does the difference in treatment between Terry stop and arrest in that intervening point invalidate everything? Well, I point the court to the case that was cited in our brief, Strickland, and the language in that case which indicates that sometimes you're in a situation where it's just so intrusive based on the particular facts and the totality of the circumstances, that it is in the realm of, you know, you just look at the arrest that actually went on and whether or not there's probable cause. I mean, there's no point to argue Terry. Thank you, counsel. Thank you. And since we used so much of yours, we'll give you two minutes for rebuttal as well. Thank you, Your Honors. Judge Clifton, I actually wanted to start with a question that you had asked Ms. Bergeson, and it was basically the court's finding was tantamount to probable cause, but seemed to be missing something, and that's absolutely right. Here, I mean, the court repeatedly, the district court repeatedly sets out the right standard, and it's noteworthy if you look at her opinion on page 22. She runs down a litany of facts that she finds are reasonable, both on the facts that were there and the officer's inferences and conclusions they drew from them. She then sets forth that these totality of circumstances would have made obvious to a prudent police officer that criminal activity likely was afoot, likely is probable, more than reasonable, and that Jay and Baker were involved. That should have been the end of the matter there. Her next sentence, though, starts to stray apart from that in the application. Although they had clear authority to conduct an investigative stop, she is equating this likely criminal activity, probable. Is that because she, like the defense counsel, believes that there had to be something more specific than generalized criminal activity that they maybe knew something was going on but weren't sure enough about what the nature of the crime was without doing an investigation? I think there are a couple responses to that. I'm not exactly sure. I'll be honest. Because on its opinion, the court articulates probable cause. I believe the court is erring in requiring the officers to be exactly right, because what she does ---- What crimes did they suspect at that point? The police were very clear that they suspected that Mr. Baker was involved and Mr. Jay in being a felon in possession on the 22nd. They also believed that when that car was associated on the 22nd with Mr. Baker, that he was, in fact, the person who was involved in the June 16th incident, which was also a felony crime, that it was all coming together. They believed unequivocally that criminal activity was happening and it involved that firearm and that both of these defendants were felons in possession. Here, I would submit there is a small hole in the district court's opinion, and that's taking the legal analysis with the findings that she makes that are uncontested and applying those. In Foush, this Ninth Circuit held that facts much less than this. In Foush, there was a report of a robbery, a generalized description, African-American male, about 6 foot, 24, blue pants, brown shirt, white shoes, running from the bank. Officers, minutes later, see a car backing quickly or driving quickly out of a driveway in the vicinity of the bank. They notice that the driver is an African-American male with short hair, and he appears to be looking around suspiciously and nervous. They pull him over, and when they pull him over, they note that he's sweating and that he is wearing blue pants. His shirt does not match, though. They order him out of the car, and they notice that he has white tennis shoes on. They then bring the teller from the bank to the scene, and they say, Is this him? And the teller is unable to identify him minutes after the incident. Nonetheless, the court of appeals held that probable cause was sufficient. Now, in that case, the defense does the same thing that the defense does here. They parse the evidence very finely. They said, Well, it was hot that day. That's why he was sweating. The court of appeals said, That could be true. They said the fact that he wasn't wearing the right shirt, that that should have eliminated him as probable cause. Counsel, you have well exceeded your time. Oh, I'm sorry, Your Honor. Sum up. If I could. Yeah. The part of the opinion you referred to on page 22, I don't think it's true. In the following sentence, although the officers had clear authority to conduct an investigative stop and take reasonable measures for their own safety pursuant to Terry v. Ohio, the government disclaims any reliance on Terry in this case. The defendant has written a very careful and detailed opinion. What's the basis for that statement that the government disclaims any reliance on Terry? After the hearing was done, Judge Brown engaged in a dialogue with myself and the other attorneys and asked, Are you abandoning Terry? And we said, No, we are not. In our supplemental briefing, we did not talk about Terry. We had briefed it on two prior occasions. We talked about it in that dialogue, but we did not put it in our supplemental brief, our third brief. And I believe based on that, that's where the district court. There is no affirmative disclaimer of reliance on Terry? No. Your Honor, I do not remember, I do not recall, and I do not see in the record anywhere where the government ever said we are disclaiming Terry. In fact, we said specifically we are still relying on it. Thank you. Thank you, counsel. Take care. We appreciate the arguments of all parties. I wish you a safe journey back to Portland. And I apologize, but I'm going to have to take another quick break. Thank you very much.
judges: Hug, Graber, Clifton